# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JULIA HOLGUIN, CARMEN HOLGUIN,
MAURICIO OREJEL, by and through his
parent and next friend, JUANA TOBANCHE, and
AMANDA FRESQUEZ, by and through her
guardian and next friend, CHRISTINA LUJAN,

      Plaintiff,

vs.                                                                            No. CIV  05-302 JB/RHS

CITY OF ALBUQUERQUE, a Municipal
Entity Organized Under the Laws of the
State of New Mexico and its subsidiary the
Albuquerque Police Department,
OFFICER ALLEN S. HANCOCK #2273,
OFFICER D. HAMMONDS # 815, OFFICER DENNIS
L. TRUJILLO # 454, OFFICER DANIEL
MAGETTERI #2758, OFFICER E. LEVELING
# 849, OFFICER ERIC BROWN, OFFICER
JAMES MONTOYA # 2275, OFFICER
MATTHEW THOMPSON # 2559, OFFICER
NICHOLAS D. GONZALES # 2229, OFFICER
PETER E. HACKETT # 529, OFFICER RUSSELL CARTER
# 2611, OFFICER RAYMOND J. DEFRATES # 545,
OFFICER RICHARD GARCIA # 1870, OFFICER S. WHITE
# 511, OFFICER SCOTT GROMMES # 844,
SGT. SHAWN O'CONNELL # 1890,
SGT. DAVID HUBBARD # 1585, SGT. S. HILL # 305,
DETECTIVE KEVIN FULLER, Officers and employees
of the Albuquerque Police Department, Individually,
CITY OF RIO RANCHO, a Municipal Entity Organized
Under the Laws of the State of New Mexico and its
subsidiary the Rio Rancho Department of Public Safety,
DETECTIVE K.P. DOERING # 1548, OFFICER G.
WISEMAN # 1142, OFFICER JASON BOWIE # 1004,
and OFFICER R. VIGIL # 1855, Officers and employees
of the Rio Rancho Department of Public Safety, Individually,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants Gonzales, Grommes, Hackett, Hammonds, Hubbard, and Leveling's Motion for Summary Judgement Requesting Dismissal of Plaintiffs' Complaint, filed November 9, 2005 (Doc. 27). The Court held a hearing on this motion on January 12, 2006. The primary issue is whether the Defendants Nicholas Gonzales, Scott Grommes, Pete Hackett, Daren Hammonds, Dave Hubbard, and Eric Leveling are entitled to qualified immunity for their actions alleged in the complaint. Because the Plaintiffs have not met their burden to show that they are entitled to discovery concerning their claims against Gonzales, Grommes, Hackett, Hammonds, and Hubbard, and they have not met their burden to show that these five Defendants violated their clearly established constitutional rights, the Court will dismiss all claims against Gonzales, Grommes, Hackett, Hammonds, and Hubbard, as they are entitled to qualified immunity. Because there is a sufficient connection between the actions that Leveling admittedly participated in and the actions that the Plaintiffs allege, and such actions could constitute a violation of the Plaintiffs' clearly established constitutional rights, the Court will delay ruling on Leveling's entitlement to qualified immunity until the Plaintiffs have an opportunity to engage in the limited discovery described by the Court below.

## FACTUAL BACKGROUND

The current lawsuit stems from the execution of a search warrant based on information that drug trafficking was occurring at 500 and 504 Adrian S.W. in Albuquerque, New Mexico. A confidential source informed police officers that drug trafficking was occurring at 500 Adrian and had been taking place for a long period of time and that drug trafficking was occurring at 504 Adrian as well. See Affidavit for Search Warrant at 2.

The officers set up a controlled purchase with the confidential source, and they searched the confidential source and "its" vehicle before the search and found no money or drugs. Id. The officers observed the following: (i) the confidential source approached a female at 504 Adrian; (ii) the confidential source handed her an unknown item; (iii) the female entered the residence at 504 Adrian for less than one minute, then walked back outside and contacted the confidential source; (iv) after contacting the confidential source, the female entered the residence at 500 Adrian and remained inside for about 2 minutes; (v) the female then walked outside and again made contact with the confidential source; and (vi) the female handed the confidential source an unknown item and then walked away. See id. at 2-3.

The confidential source turned over a small amount of suspected cocaine to the officers -- later field tested positive as cocaine -- and told the officers that the female had taken money and had handed "it" the package of cocaine. Id. at 3. The affiant and other detectives had worked with the informant and found that "its" information had been extremely accurate in the past. Id. Investigations that resulted in issuance of numerous search warrants, and the seizure of large amounts of drugs, property, and money, had verified the information that the confidential source had given in the past. See id.

### 1.      The Plaintiffs' Complaint in the Current Lawsuit.

The Plaintiffs' complaint alleges that the following occurred: (i) the Defendants forcibly entered the Plaintiffs' residence to effect a search warrant, and did not knock or inform the residents of the household that they were officers; (ii) the Defendants used a firearm to "blast the hinges off of the Plaintiffs' door and kicked it down"; (iii) the search warrant did not authorize a "no knock" entry; (iv) the Defendants threw plastic grenades through the door and "stormed" into the house; (v) the

Defendants had their weapons drawn and were aiming them at the occupants of the home; (vi) with guns aimed at them, the Defendants ordered the Plaintiffs to get on the ground and then handcuffed the Plaintiffs; (vii) Carmen Holguin was handcuffed so tightly that she had to be transported to the hospital; (viii) after handcuffing the Plaintiffs, the Defendants proceeded to search the residence, which resulted in the finding of no contraband; (ix) the Defendants made "numerous" abusive comments towards the Plaintiffs; and (x) two officers helped themselves to juice and milk from the refrigerator.  Complaint for Civil Rights Violations ¶¶ 18-22, at 7-8, filed March 18, 2005 (Doc. 1).

The Plaintiffs allege that Carmen Holguin was 80 years old at the time of the alleged events, Julia Holguin was 55 years old, Mauricio Orejel was 14 years old, and Amanda Fresquez was 15 years old.  See id. ¶ 19, at 7.

## 2.    Officers Gonzales, Grommes, and Hackett.

Julia Holguin, Carmen Holguin, Amanda Fresquez, and Mauricio Orejel all resided at 500 Adrian S.W., in Albuquerque, New Mexico in June 2003.  See Deposition of Julia Holguin (hereinafter "J. Holguin Depo.") at 9:11-20 (executed March 9, 2005).  On June 6, 2005, search warrants were executed for the residences located at 500 and 504 Adrian.  See Search Warrant (dated May 30, 2005); Affidavit for Search Warrant, No. SW 03-0001 (dated May 30, 2005); Affidavit of Nick Gonzales (hereinafter "Gonzales Aff.") ¶ 2, at 1 (executed October 7, 2005); Affidavit of Daren Hammonds (hereinafter "Hammonds Aff.") ¶ 2, at 1 (executed October 27, 2005).  Officers Gonzales, Grommes, and Hackett assisted in executing the search warrant for 504 Adrian.  See Gonzales Aff. ¶ 2, at 1; Affidavit of Scott Grommes (hereinafter "Grommes Aff.") ¶ 2, at 1 (executed October 26, 2005); Affidavit of Pete Hackett (hereinafter "Hackett Aff.") ¶ 2, at 1 (executed October 26, 2005).  Gonzales, Grommes, and Hackett did not assist in the execution of the search warrant for

500 Adrian, they did not enter 500 Adrian, nor did they have any contact with any person found in 500 Adrian.  See Gonzales Aff. ¶¶ 4-5, 7, at 1-2; Grommes Aff. ¶¶ 4-5, 7, at 1-2; Hackett Aff. ¶¶ 4-5, 7, at 1-2.

Neither Gonzales, Grommes, nor Hackett prepared the affidavit for the search warrant for 504 or 500 Adrian, and they did not have any knowledge of or involvement in the investigation that led to the application for the warrants.  See Gonzales Aff. ¶ 3, at 1; Grommes Aff. ¶ 3, at 1; Hackett Aff. ¶ 3, at 1.

### 3.    Officer Hammonds.

Officer Hammonds assisted with the execution of the search warrant for 500 Adrian, but did not enter the residence, and he did not have any contact with the persons found inside the residence. See Hammonds Aff. ¶¶ 2-4, at 1.  He did not prepare the affidavit for the search warrant for 504 or 500 Adrian, and he did not have any knowledge of or involvement in the investigation that led to the application for such warrants.  See id. ¶ 5, at 1.

### 4.    Officer Hubbard.

Officer Hubbard assisted in the execution of the search warrant for 500 Adrian.  See Affidavit of David Hubbard (hereinafter "Hubbard Aff.") ¶ 4, at 1 (executed October 25, 2005).  Julia Holguin looked outside the window and saw a police officer before any officer entered the 500 Adrian residence.  See J. Holguin Depo. at 32:12-33:22.  Officers then yelled "compromise," which indicated to Hubbard that a person inside the residence saw the SWAT team outside.  Hubbard Aff. ¶ 4, at 1.  Hubbard entered the residence after other members of the SWAT team breached the front door.  See id. ¶ 6, at 1-2.  Upon entering the residence, Hubbard announced "Police Department" and "Search Warrant," and asked the occupants to get on the ground.  Id. ¶ 7 at 2.  Officer Hubbard

participated in handcuffing Plaintiff Mauricio Orejel, and Hubbard had no contact with any other residents of 500 Adrian.  See id. ¶¶ 8-11, at 2.

Hubbard did not prepare the affidavit for the search warrant for 504 or 500 Adrian, and he did not have any knowledge of or involvement in the investigation that led to the application for such warrants.  See id. ¶ 12, at 1.

### 5.     Officer Leveling.

Officer Eric Leveling also assisted in the execution of the search warrant for 500 Adrian.  See Affidavit of Eric Leveling (hereinafter "Leveling Aff.") ¶ 2, at 1 (executed November 1, 2005).  He was positioned at a front window, and he announced "Police Department" and "Search Warrant." Id. ¶ 5-6, at 1-2.  As other members of the SWAT team began breaching the front door, he broke out a front window and pulled down a curtain so that officers could have "immediate visibility and a cover position into the house" to provide protection for the officers entering the house.  Id. ¶ 7, at 2. After the front door was breached and the entry team entered the residence, Leveling then entered the home.  See id. ¶ 8, at 2.  He searched for individuals inside the house, and after conducting such search, he contends that he watched over three females with his firearm drawn and in the depressed low ready position until the females were handcuffed.  See id. ¶¶ 9-14, at 2.  He asserts, however, that he did not handcuff anyone in 500 Adrian.  See id. ¶ 15, at 2.  Leveling does not remember which officers handcuffed the Plaintiffs.  See id. ¶ 15, at 2.

Leveling did not prepare the affidavit for the search warrant for 504 or 500 Adrian, and he did not have any knowledge of or involvement in the investigation that led to the application for such warrants.  See id. ¶ 16, at 2-3.

**PROCEDURAL BACKGROUND**

      **1.**      **The First Lawsuit.**

Plaintiffs filed an earlier lawsuit in cause no. CIV 04-0687 BB/RHS ("the First Lawsuit") on June 16, 2004. <u>See</u> Complaint, the First Lawsuit, filed June 16, 2004 (Doc. 1 in CIV 04-0687 BB/RHS). The Plaintiffs' allegations concerned the same June 6, 2003 execution of a search warrant as the allegations in this Complaint. <u>Compare</u> Complaint, the First Lawsuit, <u>with</u> Complaint, <u>Holguin v. City of Albuquerque et al</u>, No. CIV 05-302 JB/RHS ("the Second Lawsuit"). The Plaintiffs alleged in the first lawsuit that they were illegally detained and handcuffed during the execution of the warrant, and that law enforcement officers used excessive force in entry and detention. <u>See</u> Complaint, the First Lawsuit ¶¶ 15, 16, 17, 18-20, at 4-6.

On September 24, 2004, the Honorable Robert H. Scott, United States Magistrate Judge for the District of New Mexico, entered an Initial Scheduling Order setting the Rule 16 Conference and deadlines for submission of the parties' Initial Disclosures, the Initial Pre-Trial Report, and Provisional Discovery Plan. <u>See</u> Initial Scheduling Order, the First Lawsuit, filed September 24, 2005 (Doc. 6 in CIV 04-0687 BB/RHS). The Scheduling Order set a meet and confer deadline of October 27, 2004. <u>See id.</u> ¶ 1 at 1. In accordance with the Scheduling Order, Defendant City of Albuquerque served its Initial Disclosures, on November 5, 2004. <u>See</u> Defendant City of Albuquerque's Certificate of Service of Initial Disclosures, the First Lawsuit, filed November 5, 2004 (Doc. 8); Initial Scheduling Order, the First Lawsuit ¶ 4, at 1.

On November 19, 2004, the City of Albuquerque served its First Set of Interrogatories and First Request for Production of Documents upon Plaintiffs. <u>See</u> Defendant City of Albuquerque's Certificate of Service of First set of Interrogatories and First Request for Production of Documents,

-7-

the First Lawsuit, filed November 19, 2004 (Doc. 9).  On December 16, 2004, Defendant City of Albuquerque served its First Supplemental Disclosures.  See The City of Albuquerque's First Supplemental Disclosures, the First Lawsuit, filed December 16, 2004 (Doc. 11).  Defense counsel agreed to give the Plaintiffs an extension of time for serving the Plaintiffs' discovery responses -- due on December 19, 2004 -- to January 3, 2005.  See Letter from Stephanie M. Griffin to Dennis Montoya, the First Lawsuit (dated January 4, 2005).  The Plaintiffs did not provide discovery responses by January 3, 2005, and defense counsel requested submission no later than January 6, 2005.  See id.  The Plaintiffs did not provide discovery answers by January 6, 2005, and the City of Albuquerque filed a Motion to Compel, see Motion to Compel, the First Lawsuit, filed January 11, 2005 (Doc. 13), which Judge Scott granted, see Order granting Motion to Compel, the First Lawsuit, filed February 1, 2005 (Doc. 14).  The Plaintiffs' counsel provided discovery on February 8, 2005 as ordered by Judge Scott.  See Letter from Brandon Cummings to Stephanie M. Griffin, the First Lawsuit (dated February 8, 2005).

The Plaintiffs did not file a motion to extend the March 21, 2005 discovery deadline, but did, however, file a Motion to Amend the Complaint after the discovery deadline had passed.  See Plaintiffs' Motion to Amend, the First Lawsuit, filed March 23, 2005 (Doc. 17).  Judge Black set Plaintiffs' Motion to Amend for hearing on May 17, 2005, see Notice of Hearing on Plaintiffs' Motion to Amend, the First Lawsuit, filed May 13, 2005 (Doc. 25), and the day before the hearing, the Plaintiffs withdrew the Motion to Amend, see Notice of Withdrawal of Motion to Amend, the First Lawsuit, filed May 16, 2005 (Doc. 26); Letter from Dennis Montoya to Judge Black, the First Lawsuit (dated May 16, 2005).

A stipulated Order was entered on May 20, 2005 allowing the dismissal of the John and Jane

Does in the Complaint.  <u>See</u> Order of Dismissal dismissing John and Jane Does, the First Lawsuit, filed May 20, 2005 (Doc. 29).  The City of Albuquerque filed a Motion for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint.  <u>See</u> Defendant City of Albuquerque's Motion for Summary Judgment Requesting Dismissal of Complaint, the First Lawsuit, filed May 3, 2005 (Doc. 21).  In their Response, the Plaintiffs agreed to dismissal of Detective Robbin Burge without prejudice.  <u>See</u> Plaintiffs' Response to Motion for Summary Judgment, the First Lawsuit at 3, filed June 5, 2005 (Doc. 30).  Additionally, the Plaintiffs, in their response, consented to dismissal of the City of Albuquerque, but only if such dismissal was without prejudice.  <u>See</u> <u>id.</u> at 3-4.  The City of Albuquerque argued against dismissal without prejudice, and contended that dismissal as to the City of Albuquerque should be with prejudice.  <u>See</u> Defendant City of Albuquerque's Reply to Plaintiffs' Response to Motion for Summary Judgment, the First Lawsuit at 4, filed June 8, 2005 (Doc. 34).  Thereafter, Judge Black dismissed the Complaint against the City of Albuquerque with prejudice.  <u>See</u> Memorandum, Opinion, and Order, the First Lawsuit; Order, the First Lawsuit, filed July 18, 2005 (Doc. 37 in CIV 04-687 BB/RHS).

## 2.    <u>The Current Lawsuit.</u>

Gonzales, Grommes, Hackett, Hammonds, Hubbard, and Leveling, pursuant to rule 56 of the Federal Rules of Civil Procedure and D.N.M. LR-Civ. 7, request that the Court grant their Motion for Summary Judgment, dismiss the Plaintiffs' Complaint against them with prejudice, and award the moving Defendants their costs.  <u>See</u> Defendants Gonzales, Grommes, Hackett, Hammonds, Hubbard, and Leveling's Motion for Summary Judgement Requesting Dismissal of Plaintiffs' Complaint ("Motion for Summary Judgment") at 1.  The moving Defendants represent that the Plaintiffs oppose this motion.  <u>See</u> <u>id.</u> ¶ 3, at 1.

## STANDARD FOR DECIDING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. See id. at 249-50 (citations omitted). Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment. See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988). The Court may only consider admissible evidence when ruling on a motion for summary judgment. See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

## LAW REGARDING QUALIFIED IMMUNITY

### 1.    Qualified Immunity Generally.

Qualified immunity recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 506 (1978)). Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

In the specific context of qualified immunity, the United States Court of Appeals for the Tenth

Circuit has stated:

> We review summary judgment decisions involving a qualified immunity defense somewhat differently than other summary judgment rulings. In our prior decisions, we have emphasized that once a defendant raises a qualified immunity defense, the plaintiff bears a heavy burden. The qualified immunity defense cannot be analogized to other affirmative defenses because of the interests implicated in suits against government officials. Unlike other affirmative defenses, qualified immunity not only shields a defendant from liability, but is also intended to protect the defendant from the burdens associated with trial.

Hannula v. Lakewood, 907 F.2d 129, 130 (10th Cir. 1990)(citation and internal quotations omitted).

When a government official asserts the defense of qualified immunity, the burden shifts to the plaintiff to establish: (i) "that the defendant's actions violated a constitutional or statutory right."; and (ii) "if the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)(citations and internal quotations omitted). "If the plaintiff fails to carry either part of [the] two part burden, the defendant is entitled to qualified immunity." Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995).

In determining whether the right was "clearly established," the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether "the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Id. at 1128 (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)(internal quotations omitted)). The second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201 (2001). Thus, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. " Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority

from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

"If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." Medina v. Cram, 252 F.3d at 1128 (quoting Albright v. Rodriguez, 51 F.3d at 1535)(internal quotations omitted). In making this determination, the Court will view the evidence in the light most favorable to the non-moving party; however, the record must demonstrate that the plaintiff has satisfied his heavy two-part burden. See Medina v. Cram, 252 F.3d at 1128. Otherwise, the defendants' qualified immunity defense prevails. See Roberts v. Kling, 144 F.3d 710, 711 (10th Cir. 1998).

## 2.   Qualified Immunity and Discovery.

"Discovery should not be allowed until the court resolves the threshold question whether the law was clearly established at the time the allegedly unlawful action occurred." Workman v. Jordan, 958 F.2d 332, 336 (10th Cir. 1992)(citing Siegert v. Gilley, 500 U.S. 226, 231 (1991)). The court first must "determine whether the actions defendants allegedly took are actions that a reasonable person could have believed lawful." Id. (citations and internal quotations omitted). If a reasonable person could have believed that the actions were lawful, "defendants are entitled to dismissal before discovery. If the actions are not those that a reasonable person could have believed were lawful, then discovery may be necessary before a motion for summary judgment on qualified immunity grounds can be resolved." Id. See Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987)(noting that if the defendants' actions are not those that a reasonable officer could have believed lawful and "if the actions [defendant] claims he took are different from those the [plaintiffs] allege (and are actions that

-12-

a reasonable officer could have believed lawful), then discovery may be necessary before [defendant]'s motion for summary judgment on qualified immunity grounds can be resolved."). If such discovery is allowed, it "must be tailored specifically to the question of [defendant]'s qualified immunity." Anderson v. Creighton, 483 U.S. at 646 n.6.

"[I]n response to a summary judgment motion based on qualified immunity, a plaintiff's 56(f) affidavit must demonstrate how discovery will enable them to rebut a defendant's showing of objective reasonableness or, stated alternatively, demonstrate a connection between the information he would seek in discovery and the validity of the defendant's qualified immunity assertion." Lewis v. City of Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990)(citations and internal quotations omitted). To accomplish this, "it is insufficient for the party opposing the motion to merely assert that additional discovery is required to demonstrate a factual dispute or that evidence supporting a party's allegation is in the opposing party's hands." Id. (citations and internal quotations omitted).

## LAW REGARDING EXCESSIVE FORCE

"[T]he description of [] the reasonableness inquiry in excessive force cases overlaps with the qualified immunity question, which also requires the application of a reasonableness standard in order to determine whether an officer violated a clearly established right." Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001)(citation omitted). "[T]his overlap renders a qualified immunity defense of less value when raised in defense of an excessive force claim. . . . the overlap does not relieve [a court] of [its] responsibility to decide the legal questions raised by qualified immunity; it does not transform legal standards applied to undisputed material facts into factual questions necessitating further discovery." Id.

"As in other Fourth Amendment contexts . . . the 'reasonableness' inquiry in an excessive

-13-

force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989)(citations omitted).  Courts are to look at three criteria when making this reasonableness inquiry: "1) the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers, and 3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Hinton v. City of Elwood, Kan., 997 F.2d 774, 780 (10th Cir. 1993)(citation and internal quotations omitted).

### LAW REGARDING ILLEGAL DETENTION

### 1.      Seizure.

The Fourth Amendment reads in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." This guarantee is "enforceable against the States through the Fourteenth Amendment." Holland v. Harrington, 268 F.3d 1179, 1187 n.8 (10th Cir. 2001)(quoting Colorado v. Bannister, 449 U.S. 1, 2 (1980)).  "Violation of the Fourth Amendment requires an intentional acquisition of physical control." Holland v. Harrington, 268 F.3d at 1187 (quoting Brower v. County of Inyo, 489 U.S. 593, 596 (1989)).  "Freedom of movement is terminated if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Holland v. Harrington, 268 F.3d at 1187 n.9 (citation omitted).

"[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981).  And under some circumstances, a police officer may handcuff the detained occupants.  See Muehler v. Mena, 544 U.S. 93, ___, 125 S. Ct. 1465,

1470-1472 (2005).

## 2.   **Good Faith Reliance**.

"The first notion to be remembered in considering the good faith principle is the presumption [] that when an officer relies upon a warrant, the officer is acting in good faith." United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993)(quoting United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985)).  The question of good faith is "confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization," and the court must examine "the text of the warrant and the affidavit to ascertain whether the agents might have 'reasonably presumed it to be valid.'"  Id. (citations and internal quotations omitted).  An officer's reliance on a warrant depends upon whether the "underlying documents are 'devoid of factual support, not merely whether the facts they contain are legally sufficient.'  Thus 'it is only when an officer's reliance was wholly unwarranted that good faith is absent.'"  Id. (citations omitted).

There are limits to the good faith exception.  "An officer who knows or should have known that a search warrant was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence."  Id. at 1455 (citation omitted).

"[P]olice officers acting pursuant to a facially valid judicial warrant enjoy qualified immunity for executing the warrant."  Hart v. O'Brien, 127 F.3d 424, 445 (5th Cir. 1997).  See Hodge v. Layrisson, 1998 U.S. Dist. LEXIS 13930, No. CIV. A. 97-555, 1998 WL 564263, at *6 (E.D. La. Sept. 1, 1998)("Officers acting pursuant to a facially valid judicial warrant enjoy qualified immunity for executing the warrant.")(citation omitted).

## SECTION 1983 AND PERSONAL PARTICIPATION

"Personal participation is an essential allegation in a § 1983 claim." Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976)(citations omitted). "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." Foote v. Spiegel, 118 F.3d 1416, 1423-24 (10th Cir. 1997)(citing Grimsley v. MacKay, 93 F.3d 676, 679 (10th Cir. 1996)).

## ANALYSIS

Gonzales, Grommes, Hackett, and Hammonds did not personally participate in the Plaintiffs' alleged violations, and thus are entitled to qualified immunity. The initial detention and seizure of the Plaintiffs was lawful, and, therefore, Leveling and Hubbard are entitled to qualified immunity on the Plaintiffs' claims that they were initially unlawfully seized. The initial use of handcuffs on Orejel by Hubbard was reasonable and did not violate Orejel's clearly established constitutional rights. Further discovery is, however, warranted and necessary to determine the extent of Leveling's role in Julia Holguin's, Carmen Holguin's, and Amanda Fresquez' excessive force claims.

## I.   THE PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY CONCERNING GONZALES', GROMMES', AND HACKETT'S ACTIONS, NOR HAVE THEY MET THEIR BURDEN TO SHOW THAT GONZALES, GROMMES, AND HACKETT VIOLATED THEIR CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS.

Gonzales, Grommes, and Hackett participated in the execution of the 504 Adrian warrant and did not participate in the execution of the search warrant for 500 Adrian, nor did they have any contact with anyone who was found inside 500 Adrian. They also did not have any knowledge of or involvement in the investigation that led to the application for the search warrants. The Plaintiffs have not pointed to evidence showing any constitutional violation that Gonzales, Grommes, and Hackett committed.

**A.   GONZALES, GROMMES, AND HACKETT DID NOT PARTICIPATE IN THE EXECUTION OF THE 500 ADRIAN SEARCH WARRANT AND DID NOT HAVE ANY CONTACT WITH THE OCCUPANTS OF 500 ADRIAN.**

Gonzales, Grommes, and Hackett did not individually participate in the execution of the 500 Adrian search warrant, nor did they have any knowledge of the underlying investigation leading to the application for the search warrants. Because the Plaintiffs have not shown that these three officers violated their constitutional rights, Gonzales, Grommes, and Hackett are entitled to qualified immunity.

The Plaintiffs' counsel attached a rule 56(f) affidavit to the response brief. See Affidavit of Dennis W. Montoya, ESQ. Pursuant to Fed.R.Civ.P.56(f) (hereinafter "rule 56(f) affidavit") (executed November 18, 2005). In the rule 56(f) affidavit, the Plaintiffs' counsel asserts that formal discovery is needed to show which individuals were the "sole source of information regarding which officers kicked, handcuffed, and pointed guns at plaintiffs." Id. ¶ 3, at 1. He also contends that formal discovery is necessary to show that "Detective Robbin Burge deliberately gave false testimony in support of her request for the subject search warrant," and "to determine whether or not the Defendants in the instant case were aware that the search warrant was based on false testimony." Id. ¶¶ 4-5, at 2.

Although the rule 56(f) affidavit specifies what information the Plaintiffs are seeking in discovery, the affidavit does not demonstrate a "connection between the information [sought] in discovery and the validity of the defendant's qualified immunity assertion." Lewis v. City of Ft. Collins, 903 F.2d at 758. The assertions and requests in the affidavit appear to the Court to be a fishing expedition. The affidavit does not indicate any basis for the possibility that these officers were aware that the search warrant was based on false testimony, nor does it indicate what the effect of

-17-

these three Defendants' possibly perjured testimony would be on the validity of the qualified immunity defense. That an officers' version of the facts might be incorrect does not automatically mean that the correct version of the facts establishes a violation of a clearly established constitutional right. The affidavit does not sufficiently link the discovery the Plaintiffs are seeking to the validity of the Defendants' qualified immunity defense.[1]

Gonzales, Grommes, and Hackett have presented evidence that they did not participate in the execution of the 500 Adrian search warrant and that they did not have any interaction with any of the people residing in 500 Adrian. They also have sworn that they did not have any knowledge of or involvement in the investigation that led to the application of the search warrant for 500 or 504 Adrian. The Plaintiffs do not assert that these three Defendants participated in the search of 500 Adrian, nor that they had knowledge of or involvement in the investigation leading to the application. The Plaintiffs merely raise the possibility -- through speculation without any factual basis -- that some

---

[1] The Plaintiffs' counsel, in the rule 56(f) affidavit, also asserts that formal discovery is necessary to include information about the nature of the training provided to the Defendants regarding use of force, use of firearms, and handcuffing techniques and procedures, and will include Requests for Production for materials provided to Defendants when they were trained in the use of force, use of firearms, and handcuffing techniques and procedures. See rule 56(f) affidavit ¶ 3, at 1-2. Again, the Plaintiffs do not connect this information with the validity of the qualified immunity defense. They state only that they need this information and do not inform the Court why they need it. If they need this information for the training and supervision claim against the City of Albuquerque, this motion is not the proper context in which to ask for the information, because this is a qualified immunity dispute, and the City of Albuquerque has not raised a qualified immunity defense. Additionally, the Court ruled at the February 10, 2006 Pre-Trial Conference, that it was granting the Defendant City of Albuquerque's Motion for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint Based upon the Doctrine of Res Judicata/Collateral Estoppel, filed August 5, 2005 (Doc. 10). Accordingly the Court will dismiss the claims against the City, and the discovery sought concerning training does not appear to the Court to be relevant to the remaining claims against these six Defendants. The Court, however, is making assumptions as to the connection between the discovery and the validity of the qualified immunity defense that the Plaintiffs did not argue or discuss. The Plaintiffs may have a different and valid reason for needing such discovery, but they have not shared that reason with the Court.

-18-

Defendants may be lying, but do not show the Court how such a possibility affects the qualified immunity defense. The Plaintiffs do not assert here that Gonzales, Grommes, and Hackett are lying, but only raise the possibility that they could be.

The Plaintiffs basically request a fishing expedition for these three Defendants based only on an asserted possibility that these Defendants could be lying. This is insufficient to overcome the qualified immunity defense here, and is insufficient justification for the Court to allow the Plaintiffs to engage in the broad discovery of deposing each Defendant to determine if these Defendants are being truthful.

The Plaintiffs, in a rule 56(f) affidavit, must tell the Court specifically what they seek to discover and how such information is connected to the validity of the qualified immunity defense. The Plaintiffs may have very valid arguments as to what discovery would specifically prove, and as to how such proof would affect the qualified immunity defense. They have not, however, provided such arguments to the Court and as such, they have not met their rule 56(f) burden in the qualified immunity context.

In addition to their rule 56(f) affidavit, the Plaintiffs' response brief to the qualified immunity defense is insufficient to meet the two-part burden of showing a violation of a constitutional right, and that such right was clearly established. The Plaintiffs contend that they need more discovery and that their rule 56(f) affidavit entitles them to such discovery. They contend that they are entitled to depose these officers, depose the other officers at the scene, and compare all of the testimony. See Response in Opposition to Defendants Gonzales, Grommes, Hackett, Hammond, Hubbard, and Leveling's Motion for Summary Judgment ("Response") at 4-6, filed November 28, 2005 (Doc. 32). They again fail to point the Court to how such discovery will affect the qualified immunity defense. They

-19-

concede that, if the three officers' affidavits are proven true, then they will likely dismiss these three Defendants from the case, but they do not argue or show what the result will or should be if the testimony in the affidavits is proven false. See id. at 6.

The officers may have violated the Plaintiffs' rights, and such rights may be clearly established, but the Plaintiffs have not made such arguments to the Court, and thus they have not shown that they are entitled to the discovery sought. It is not the Court's job to assume, guess, and surmise what the Plaintiffs' arguments are, nor is it the Court's job to make the Plaintiffs' arguments for them or decide what the connection is between the discovery sought and the validity of the qualified immunity defense. Adler v. Wal Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998)("[T]he district courts [] have a limited and neutral role in the adversarial process, and [should be] wary of becoming advocates who comb through the record . . . and make a party's case for it.")(citation omitted). This principle is particularly true in the qualified immunity context, where the plaintiff bears a burden to show that a constitutional right was violated, and that such right was clearly established. The evidence before the Court shows the opposite. Gonzales, Grommes, and Hackett did not personally participate in the complained of actions, and Plaintiffs have not met their burden to show that these three Defendants violated their clearly established constitutional rights.[2] Therefore these three Defendants are entitled to qualified immunity. See Roberts v. Kling, 144 F.3d 710, 711 (10th Cir. 1998).

---

[2] The Plaintiffs contend that the Defendants' affidavits are not sufficient because affidavits "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." Response ¶ 4, at 1. These affidavits are legally sufficient, because they are based on the Defendants' first-hand knowledge and contain testimony that would be admissible in evidence. That they are self-serving does not mean they are not useful, because all affidavits are self-serving to some degree.

Gonzales, Grommes, and Hackett did not personally participate in the actions of which the Plaintiffs complain, and therefore the Plaintiffs have not shown that their actions were objectively unreasonable and that they violated clearly established constitutional rights. Because a reasonable fact finder could not interpret Gonzales', Grommes', and Hackett's actions as being objectively unreasonable, the Plaintiffs are not entitled to discovery as to these three Defendants. See Anderson v. Creighton, 483 U.S. at 635 n.6.

The Plaintiffs, in response to the qualified immunity defense, sought only a delay in the ruling to permit discovery, and did not meet their burden to show that they are entitled to such discovery, nor did they argue or contend that these three Defendants violated their clearly established constitutional rights. The Plaintiffs therefore have not met their burden in the qualified immunity context. Gonzales, Grommes, and Hackett are entitled to qualified immunity, and the Court will dismiss all claims against Gonzales, Grommes, and Hackett.[3]

## II.  THE PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY CONCERNING HAMMONDS' ACTIONS, NOR HAVE THEY MET THEIR BURDEN TO SHOW THAT HAMMONDS VIOLATED THEIR CONSTITUTIONAL RIGHTS.

Although Hammonds participated in the execution of the search warrant for 500 Adrian, he

---

[3] The Defendants contend that the Plaintiffs do not have standing to assert any alleged violations for the search of the 504 Adrian residence. See Defendants Gonzales, Grommes, Hackett, Hammonds, Hubbard, Leveling's Memorandum in Support of Their Motion for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint ("Memorandum in Support") at 5, filed August 5, 2005 (Doc. 11). The Plaintiffs do not deny this contention in their response. See generally Response. Because the Plaintiffs have not alleged any expectation of privacy in the 504 Adrian residence, they do not have standing to challenge alleged violations that occurred during the execution of the search warrant for 504 Adrian. See United States v. Leary, 846 F.2d 592, 595 (10th Cir. 1988)("Determining whether a legitimate or justifiable expectation of privacy exists . . . involves two inquiries. First, the claimant must show a subjective expectation of privacy in the area searched, and second, that expectation must be one that society is prepared to recognize as reasonable.").

secured the perimeter and did not enter the residence, and he did not have any contact with the occupants found inside the residence.  He did not prepare the affidavit for the search warrant for 504 or 500 Adrian, and he did not have any knowledge of or involvement in the investigation that led to the application for such warrants.

As discussed above, because Hammonds did not participate personally, he does not have individual liability.  The Plaintiffs do not contend that Hammonds violated any clearly established rights when he secured the perimeter and had no contact with the occupants, but again argue the necessity of additional discovery.  Hammonds' argument concerning his personal participation is essentially the same as that for Gonzales, Grommes, and Hackett, and the Plaintiffs do not discuss Hammonds' qualified immunity claim separately from their discussion of Gonzales, Grommes, and Hackett.  For the same reasons the Court gave in finding that Gonzales, Grommes, and Hackett are entitled to qualified immunity and in finding that the Plaintiffs in their response and in their rule 56(f) affidavit have not shown entitlement to additional discovery concerning the qualified immunity of such Defendants, the Court finds that Hammonds is entitled to qualified immunity and that the Plaintiffs have not shown that they are entitled to discovery concerning Hammonds' qualified immunity defense.  The Court will dismiss all claims against Hammonds.

## III.   THE PLAINTIFFS ARE NOT ENTITLED TO  DISCOVERY CONCERNING WHETHER LEVELING AND HUBBARD KNEW THAT THE SEARCH WARRANT WAS BASED ON ROBBIN BURGE'S ALLEGED FALSE TESTIMONY, AND LEVELING AND HUBBARD ARE ENTITLED TO QUALIFIED IMMUNITY FOR THE INITIAL DETENTION/SEIZURE OF THE PLAINTIFFS.

Hubbard assisted in the execution of the search warrant for 500 Adrian.  He heard officers yell "compromise," which indicated to Hubbard that a person inside the residence saw the SWAT team outside.  He entered the residence after other members of the SWAT team had already breached the

front door, and upon entering the residence, Hubbard announced "Police Department" and "Search Warrant," and asked the occupants to get on the ground.  Hubbard participated in handcuffing Plaintiff Mauricio Orejel, but he had no contact with any other occupants of 500 Adrian.  He did not prepare the affidavit for the search warrant for 504 or 500 Adrian, and he did not have any knowledge of or involvement in the investigation that led to the application for such warrants.

Leveling also assisted in the execution of the search warrant for 500 Adrian.  He announced "Police Department" and "Search Warrant," and as other members of the SWAT team began breaching the front door, he broke out a front window and pulled down a curtain to provide protection for the officers entering the house.  After the front door was breached and the entry team entered the residence, Leveling then entered the home.  He searched for individuals inside the house, and after conducting such search, he watched over three females and contends that he did so with his firearm drawn and in the depressed low ready position until the females were handcuffed.  He asserts that he did not handcuff anyone in 500 Adrian.  He did not prepare the affidavit for the search warrant for 504 or 500 Adrian, and he did not have any knowledge of or involvement in the investigation that led to the application for such warrants.

The Court finds that the Plaintiffs are not entitled to formal discovery concerning the issue whether the officers were aware that the search warrant was based on alleged false testimony based on the rule 56(f) affidavit.  In the rule 56(f) affidavit, the Plaintiffs argue that they are entitled to formal discovery to determine whether any of the officers were aware that the search warrant was based on Robbin Burge's alleged false testimony.  See Rule 56(f) Affidavit ¶ 5, at 2.

Again, the Plaintiffs have not connected the discovery sought to the validity of the qualified immunity defense.  Even if the Court were to make the argument for the Plaintiffs that the discovery

is necessary to show whether the Defendants relied in good faith on the search warrant, and therefore would show whether they were entitled to detain the Plaintiffs, this argument would appear to conflict with the Plaintiffs' statement in their response. The Plaintiffs state that "Defendants' entitlement to summary judgment on the wrongful detention counts hinges upon the lawfulness of the warrant and any grant of summary judgment should therefore follow that determination," and that the law requires the detentions to have occurred "during the execution of a lawful warrant." Response at 7-8. The Plaintiffs have not indicated the connection whether the officers knew of the false statement, and they certainly have not shown its connection in light of their argument that the detention was only lawful if the search warrant was lawful.

Also, the Plaintiffs have not alleged in their pleadings, in their response to the qualified immunity defense, or in the rule 56(f) affidavit that any of these Defendants were aware of the alleged false testimony. With a lack of even an allegation that the Defendants were aware of the alleged false testimony, the requested discovery again appears to the Court to be a fishing expedition based on the Plaintiffs' hope that the Defendants' sworn statements -- that they did not have any knowledge of or participate in the investigation leading up to the application for the search warrant -- will turn out to be false. The hope that a possibility might later prove true is insufficient to subject defendants who have asserted a qualified immunity defense to formal discovery.

Notably, the Plaintiffs in the rule 56(f) affidavit assert that "upon information and belief, [we] will be able to demonstrate that Detective Robbin Burge deliberately gave false testimony in support of her request for the subject of the search warrant." Rule 56(f) Affidavit ¶ 4, at 2. There is, however, no such allegation, concerning the Defendants' knowledge of such false testimony, in the rule 56(f) affidavit, in the Plaintiffs' response to the qualified immunity defense, or in the Complaint.

-24-

Because the Plaintiffs have not connected the discovery sought concerning the Defendants' knowledge of the alleged false testimony, and the discovery appears to be a fishing expedition, the Court will not allow the Plaintiffs to engage in such discovery for these Defendants pursuant to the rule 56(f) affidavit.

### A.  LEVELING AND HUBBARD ARE ENTITLED TO QUALIFIED IMMUNITY FOR THE PLAINTIFFS' INITIAL DETENTION/SEIZURE.

Leveling participated in the detention of Julia Holguin, Carmen Holguin, and Fresquez, by at a minimum keeping a watch over them with his gun in a low ready position.  He does not assert that he did not detain them.  He also does not contend that "a reasonable person would have believed that he was no free to leave." Holland v. Harrington, 268 F.3d at 1187 n.8.  Hubbard participated in the detention of Orejel, by assisting in his handcuffing.  He also does not contend that he did not participate in detaining Orejel.

Leveling and Hubbard assert that their participation in the detention of the Defendants was lawful because it was based on good-faith reliance on a search warrant authorizing the search for contraband.  See Memorandum in Support at 8-9; APD Defendants' Reply to Plaintiffs' Response in Opposition to Defendants Gonzales, Grommes, Hackett, Hammonds, Hubbard, and Leveling's Motion for Summary Judgment ("Reply") at 7-8, filed September 6, 2005 (Doc. 14).

The Plaintiffs contend that the unlawful detention claims hinge on the lawfulness of the search warrant, and that a decision on qualified immunity should not be made until the lawfulness of the search warrant is decided.  See Response at 7-8.  The Court does not believe that the unlawful detention claims hinge on whether the search warrant was unlawful based on the alleged false testimony of Robbin Burge, but rather, the claims hinge on whether the officers executing the warrant were entitled to reasonable good faith reliance on the facially valid search warrant.  Even if the search

was based on false testimony, the Defendants -- the executing officers -- are still entitled to rely in it in reasonable good faith.

First, "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. at 705 (footnotes omitted).  Second, officers relying on a search warrant are presumed to be acting in good faith.  See United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993).  And, "police officers acting pursuant to a facially valid judicial warrant enjoy qualified immunity for executing the warrant."  Hart v. O'Brien, 127 F.3d at 445.

The Plaintiffs contend that a detention of residents pursuant to Summers is only lawful if the underlying search warrant is valid.  See Response at 7-8.  The Court disagrees with the Plaintiffs' interpretation of Summers' holding.  The Supreme Court of the United States in Summers did not decide whether an officer, relying on a search warrant in good faith, lawfully seized residents where the search warrant later turned out to be invalid.  No argument was made in Summers that the search warrant was invalid, and thus the Court there did not determine that issue.

Although the Court has found no cases that have directly addressed this issue, the language and rationale used in both Michigan v. Summers, and Muehler v. Mena indicate that a police officer is entitled to detain residents of a place to be searched pursuant to Summers where the officers rely on the search warrant in good faith.  For example, the Summers Court stated:

> Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband.  A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.  Indeed, we may safely assume that most citizens -- unless they intend flight to avoid arrest -- would elect to remain in order to observe the search of

their possessions.

452 U.S. at 701 (footnotes omitted).  The Supreme Court continued:

> A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime.  Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home.  The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.
>
> * * * *
>
> If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid search warrant to search his home.

Id. at 703-705 (footnotes omitted).

The Supreme Court in Muehler v. Mena stated, in relation to Summers,

> An officer's authority to detain incident to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure. Thus, [the occupant's] detention for the duration of the search was reasonable under Summers because a warrant existed to search 1363 Patricia Avenue and [the detainee] was an occupant of that address at the time of the search.

125 S. Ct. 1465, 1470 (citations and internal quotations omitted).

The Court in Summers found that the detention was appropriate because the character of the "additional intrusion caused by detention is slight and because the justifications for detention are substantial."  Muehler v. Mena, 125 S. Ct. at 1469 (citing Michigan v. Summers, 542 U.S. at 701-705).  The Court in Summers, recognized: "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.  The risk of harm to both the police and occupants is minimized if the officers routinely exercise unquestioned command of the situation."  Michigan v. Summers, 452 U.S. at 702-703.

The <u>Summers</u>' Court relied on three legitimate law enforcement interests that provided justification for detaining a resident in that situation: "[P]reventing flight in the event that incriminating evidence is found; minimizing the risk of harm to the officers; and facilitating the orderly completion of the search, as detainees' self-interest may induce them to open locked doors or locked containers to avoid the use of force." <u>Muehler v. Mena</u>, 125 S. Ct. at 1469-70 (citation and internal quotations omitted).

The <u>Summers</u>' rationale relies extensively on the presence of a neutral and detached magistrate making a probable cause determination, and explains that such a determination by a magistrate that authorizes an invasion into the home, combined with the connection of the occupant to that home, gives the officers an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant. The <u>Summers</u>' rationale also justifies the detention because the incremental intrusion is outweighed by the law enforcement interests of preventing flight, minimizing risk of harm to officers, and completing an orderly search.

That an officer is relying in good faith on a search warrant that may later turn out to be invalid does not increase this incremental intrusion nor does it lessen the law enforcement interests described above. Courts should not suppress any evidence found pursuant to reasonable, good faith reliance. <u>See</u> <u>United States v. Tisdale</u>, 248 F.3d 964, 972 (10th Cir. 2001)("[T]he Fourth Amendment's exclusionary rule should not bar the use of evidence obtained by police officers acting in good faith and with reasonable reliance on a facially valid search warrant.")(citation omitted). There is still a need to prevent flight if incriminating evidence is found. There is also still a risk of harm to officers and a need to complete an orderly search.

There is nothing in the Supreme Court's opinion in <u>Summers</u> that indicates that the Supreme

-28-

Court would not apply reasonable good faith reliance in that situation, and application of reasonable good faith reliance pursuant to Summers in the qualified immunity context is consistent with the qualified immunity standard.  To determine whether a right was clearly established, "[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz,  533 U.S. 194, 202 (2001).  It would be incongruous to hold that a police officer acting in reasonable, good faith, in detaining a person pursuant to Summers could be liable for relying on a search warrant that was facially valid.  A police officer detaining an individual pursuant to Summers is entitled to reasonable, good-faith reliance on a facially valid search warrant, and does not violate a constitutional right simply because the warrant later turns out to be invalid.

Even if the Court found that an initial Summers' detention here violated the Plaintiffs' rights to be free of an unreasonable search and seizure, the Plaintiffs have not shown that right was clearly established.  The Court has found no court that has addressed the specific issue, and the language in Summers combined with the principle of good faith reliance shows that the right was not "sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Medina v. Cram, 252 F.3d at 1128.  See also Medina v. City and County of Denver, 960 F.2d at 1498 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.").

The issue of the lawfulness of the detention, therefore, hinges on whether the officers relied on the warrant in reasonable good faith.  As explained above, if the officers relied on the warrant in reasonable, good faith, then they did not violate the Plaintiffs' constitutional rights in their initial

detention because the warrant authorized a search for guns and drugs similar to the warrant in Summers. If, however, the officers were not reasonable in their good faith reliance on the search warrant, then the officers did violate the Plaintiffs' clearly established constitutional right to be free from unreasonable search and seizure.[4]

The question of good faith is "confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization," and the court must examine "the text of the warrant and the affidavit to ascertain whether the agents might have 'reasonably presumed it to be valid.'" United States v. McKneely, 6 F.3d at 1454.

The Court has examined the text of the warrant and the affidavit and finds that the agents reasonably presumed it to be valid. The warrant and affidavit contain specific and detailed information as to the location of the residences to be searched, the person expected to be found at the residences, and the contraband expected to be found and seized at the residences. See Search Warrant at 1; Affidavit for Search Warrant at 1-3.

The warrant and affidavit also contain sufficient information to show probable cause. The information was given by a reliable confidential source, and was partly corroborated by the applying officers who watched a controlled purchase take place. The confidential source informed the officers that drug trafficking occurred at 500 Adrian and had been taking place for a long period of time and

───────────────

[4] For purposes of determining the qualified immunity issue, the Court will look at the facts alleged in the light most favorable to the Plaintiffs and assume that the search warrant was invalid as asserted by the Plaintiffs. See Holland v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001)("A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.")(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).

that drug trafficking was occurring at 504 Adrian as well. See Affidavit for Search Warrant at 2. The officers set up a controlled purchase with the confidential source, and they searched the confidential source and "its" vehicle before the search and found no money or drugs. Id. The officers observed the following: (i) the confidential source approached a female at 504 Adrian; (ii) the confidential source handed her an unknown item; (iii) the female entered the residence at 504 Adrian for less than one minute, then walked back outside and contacted the confidential source; (iv) after contacting the confidential source, the female entered the residence at 500 Adrian and remained inside for about 2 minutes; (v) the female then walked outside and again made contact with the confidential source; and (vi) the female handed the confidential source an unknown item and then walked away. See id. at 2-3.

The confidential source turned over a small amount of suspected cocaine to the officers -- later field tested positive as cocaine -- and told the officers that the female had taken money and had handed "it" the package of cocaine. Id. at 3. The affiant and other detectives had worked with the informant and found that "its" information had been extremely accurate in the past. Id. Investigations that resulted in issuance of numerous search warrants, and the seizure of large amounts of drugs, property, and money, had verified the information that the confidential source had provided in the past. See id.

The officers executing the search warrant were reasonable in relying in good faith on its contents. The Plaintiffs, in their response, do not dispute that the search warrant is facially valid, nor that the officers were entitled to rely on it in reasonable good faith, but rather, argue only that the issue of the illegal detention "hinges" on the lawfulness of the search warrant and that the Court should delay its ruling until such determination is made. See Response at 8. The Plaintiffs have not shown

that they are entitled to discovery, and have not met their burden to show that the initial

seizure/detention violated a clearly established constitutional right.[5]

## IV.   THE PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY CONCERNING HUBBARDS' HANDCUFFING OF MAURICIO OREJEL, AND HAVE NOT MET THEIR BURDEN TO SHOW THAT HUBBARD VIOLATED OREJEL'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS WHEN HE ASSISTED IN HANDCUFFING HIM.

Hubbard participated in handcuffing Plaintiff Mauricio Orejel, and Hubbard had no contact

with any other residences of 500 Adrian.  He also did not prepare the affidavit for the search warrant

for 504 or 500 Adrian, and he did not have any knowledge of or involvement in the investigation that

led to the application for such warrants.  Orejel did not suffer any permanent injuries or injuries that

required treatment.  See Plaintiff's Answer Defendant City of Albuquerque's First Set of

Interrogatories to Plaintiff Mauricio Orejel at 2.

As discussed previously, the initial detention of Orejel did not, pursuant to Summers, violate

his clearly established constitutional rights.  The officers could reasonably rely in good faith on the

facially valid search warrant, and, similar to the situation in Summers, the warrant authorized a search

for drugs and guns.

Hubbard contends that allegations of tight handcuffs do not constitute excessive force and that

temporary injuries cannot be the basis for excessive force claims.  See Memorandum in Support at

11; Reply at 10-11; Transcript of Hearing at 39:1-9.  In response to Hubbard's qualified immunity

defense, the Plaintiffs contend that the use of handcuffs in an unreasonable manner is an excessive use

---

[5] The Plaintiffs in the Complaint originally titled this claim as "Unlawful Arrest/Detention in Violation of the Fourth Amendment."  Complaint at 9-11.  The Plaintiffs in response to the assertion of qualified immunity do not, however, contend that their detention turned into an arrest.  The Court's analysis might be different if the seizure turned into an arrest, because Summers gave officers authority only to detain occupants, and did not give officers authority to arrest occupants.

of force.  See Response at 9-10.

First, a plaintiff does not have to allege permanent injuries to succeed on an excessive force claim.  See Holland v. Harrington, 268 F.3d at 1195 ("Nor does the fact that none of the plaintiffs suffered physical injury during the raid foreclose a finding of excessive force.").  Second, although the use of handcuffs to detain a resident of a house to be searched for contraband, pursuant to Summers, may be reasonable, see Muehler v. Mena, 125 S. Ct. at 1470-72, the use of handcuffs can constitute excessive force if applied in an unreasonable manner.  See Findings of Fact and Conclusions of Law, Dimas Barela v. APD Officer Rob Simmons, No. CIV 01-1354 BB ¶¶ 10-24, at 2-5 (Docket No. 115).  See also Martin v. Heideman, 106 F.3d 1308, 1312-13 (6th Cir. 1997), Palmer v. Sanderson, 9 F.3d 1433, 1436 (9th Cir. 1993); Lester v. City of Chicago, 830 F.2d 706, 714 (7th Cir. 1987).

Carmen Holguin, Julia Holguin, and Amanda Fresquez all pled excessive force claims separate from their unlawful arrest/seizure claims in the Complaint.  See Complaint ¶¶ 27-42, 59-79, at 9-11, 14-19.  Carmen Holguin alleged that she was handcuffed so tightly that she suffered injury.  See id. ¶ 63, at 15.  Julia Holguin alleged that she suffered an injury as a result of being kicked in the back and/or stepped on.  See id. ¶ 72, at 17.  Amanda Fresquez alleged that she suffered an injury from being kicked in the back.  See id. ¶ 77, at 18-19.  Orejel, however, does not appear to plead an excessive force claim, but does plead an unlawful arrest/detention claim.

The Supreme Court in Muehler v. Mena found that "inherent in Summers' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention."  125 S. Ct. at 1470.  The Court held that the 2 to 3 hour use of handcuffs did not outweigh the government's continuing safety interests where the warrant authorized a search for

weapons and a wanted gang member resided on the premises, where there were four detainees on the premises, and where only two officers were present.  See id. at 1471.  The Court, in Muehler v. Mena, stated that "the governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises.  In such inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants."  Id. at 1470-71.  The Court continued: "Though this safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of the handcuffs all the more reasonable."  Id.

Here, the officers were executing a search warrant, which authorized them to search for narcotics, firearms, and ammunition.  Although this situation is not identical to that in Muehler v. Mena, the inherent risks are still present.  The officers were searching for drugs and guns.  "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.  The risk of harm to both the police and occupants is minimized if the officers routinely exercise unquestioned command of the situation." Michigan v. Summers, 452 U.S. at 702-703.  The inherent risk of a search for narcotics that the Supreme Court recognized in Summers, and the authorized search for weapons and ammunition combined with multiple detainees, makes reasonable the proper use of handcuffs on Orejel.

Regardless, Orejel has not met his burden to show that Hubbard violated his clearly established constitutional rights by assisting in handcuffing him.  Orejel does not contend that the use of the handcuffs in this situation was unreasonable, but rather, he contends that because there has been no discovery, he has not had an opportunity to show the handcuffs were not applied in a reasonable

manner, and requests discovery to demonstrate that the use of the handcuffs in this situation was unreasonable.

Orejel has not shown that he is entitled to discovery on this issue. He has not told the Court what facts he needs to gain in discovery. Also, it does not appear to the Court that Orejel is alleging in the Complaint that the handcuffs were applied in an unreasonable manner, but rather, if anything, Orejel is complaining that any use of the handcuffs at all was unreasonable. Finally, all of the information needed to defeat an assertion of qualified immunity is in the Plaintiff's reach. Orejel does not allege that he was handcuffed in a rough manner, that his handcuffs were applied incorrectly or too tightly, or that his detention in handcuffs was for an unreasonable amount of time. Orejel has first hand knowledge of all such allegations that might tend to show unreasonable use of handcuffs.

Sufficient allegations by Orejel could defeat a qualified immunity defense by Hubbard even in the face of controverted facts, because in the qualified immunity context, the Court is to look at the allegations in the light most favorable to the plaintiff. For example, if Orejel had alleged that he complied with the officers commands, and they still roughly applied the handcuffs, that the handcuffs were too tight, that he complained to the officers that the handcuffs were too tight several times, that the police ignored his complaints, and that they left him handcuffed too tightly for five hours, the Court might find that Hubbard was not entitled to qualified immunity. See Findings of Fact and Conclusions of Law, Dimas Barela v. APD Officer Rob Simmons, ¶¶ 10-24, at 2-5. Orejel, however, has not alleged any such things, and therefore he has not met his burden to show that Hubbard violated his clearly established constitutional rights by applying handcuffs in an unreasonable manner. Pursuant to Muehler v. Mena, Hubbard did not violate Orejel's clearly established constitutional rights

by applying the handcuffs initially in this situation.[6]

## V. THE PLAINTIFFS ARE ENTITLED TO LIMITED DISCOVERY CONCERNING LEVELING'S CONTACT WITH CARMEN HOLGUIN, JULIA HOLGUIN, AND AMANDA FRESQUEZ, AND THE COURT WILL DELAY RULING AS TO LEVELING'S ENTITLEMENT TO QUALIFIED IMMUNITY CONCERNING THE PLAINTIFFS' EXCESSIVE FORCE CLAIMS.

Leveling contends that, while he "watched over" the three females, he had his gun in a depressed low ready position, which means it was pointed at the ground. The Plaintiffs contend, however, that the gun was pointed at their faces from 10 to 15 feet away. See Deposition of Amanda Fresquez (hereinafter "Fresquez Depo.") at 57:9-58:25; 61:2-4.

The Court believes that the Plaintiffs' response, combined with the rule 56(f) affidavit, sufficiently connects the discovery sought to the validity of the qualified immunity defense as to Leveling, and the Court will delay ruling on Leveling's motion for summary judgment based on qualified immunity until the Plaintiffs have had an opportunity to participate in narrowly tailored discovery on the issue of qualified immunity.

The Plaintiffs' request for discovery here is cast in a different light and has more merit then their requests for discovery concerning the actions of the other previously discussed officers. Leveling concedes that he entered the residence and admits that he had contact with the Plaintiffs. In addition, the Plaintiffs' allegations contradict Leveling's recitation of the facts. The Plaintiffs' request for discovery has a more substantial basis where Leveling has admitted to some activity and contact with the Plaintiffs, and where the Plaintiffs have alleged facts that can be reasonably connected

---

[6] The Court also notes that there is some discovery available to the Plaintiffs from the discovery that the Plaintiffs and the City of Albuquerque conducted in the case before Judge Black. See Defendant City of Albuquerque's Initial Disclosures, The First Lawsuit at 1-7; Defendant's First Supplemental Disclosures, The First Lawsuit at 1-5; Fresquez Depo.; J. Holguin Depo. Also, the Defendants report that the Plaintiffs never requested or attempted to depose any witnesses in that case.

to Leveling.  The Plaintiffs' alleged facts could constitute a violation of a clearly established right.

Such a request goes beyond the before described "hope of a possibility" concerning Gonzales, Grommes, Hackett, and Hammonds.  This situation is also different from the discovery request as to Hubbard.  Discovery was not necessary to decide the issue whether the initial detention and proper application of handcuffs on Orejel violated a clearly established constitutional right, and any facts necessary to show that the handcuffs were used in an unreasonable manner were in Orejel's reach and not alleged.

Here, however, viewing the allegations in the light most favorable to the Plaintiffs, the Court notes that Carmen Holguin, Julia Holguin, and Amanda Fresquez allege that at least some officers pointed guns directly at them, handcuffed them, and either applied the handcuffs too tightly, or kicked and or stepped on them.  See Fresquez Depo. at 57:3-58:24; 61:2-4; Complaint ¶¶ 20, 21, 22, 63, 70, 77, at 8, 15, 17, 19.  Leveling was watching over the three females, and is therefore closely connected in both time and space to their allegations.

"As in other Fourth Amendment contexts . . ., the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397(1989).  Courts are to look at three criteria when making this reasonableness inquiry: "1) the severity of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of the officers, and 3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Hinton v. City of Elwood, Kan., 997 F.2d at 780 (citations and internal quotations omitted).  Although the search warrant here authorized a search for guns and drugs, the Plaintiffs were detained and in handcuffs, and there is no indication that they were

-37-

resisting arrest or attempting to evade arrest by flight.  Thus, the alleged intentional kicking and/or stepping on the back of the Plaintiffs while they were detained in handcuffs, on the ground, offering no resistance, and held at gun point could be objectively unreasonable and could violate clearly established constitutional rights.[7]

Because the allegations described above, viewed in the light most favorable to the Plaintiffs, are sufficiently connected in time and space to Leveling and such actions could be found to be objectively unreasonable, the Plaintiffs are entitled to limited discovery as to Leveling's actions.  See Anderson v. Creighton, 483 U.S. at 635 n.6.

The Court realizes that Leveling may not have participated in any of the above-described actions, and does not suggest by this ruling that he did so, but his admissions in combination with the Plaintiffs' allegations sufficiently connect him to alleged activities that could establish a violation of a clearly established constitutional right for the Court to allow limited discovery to determine which actions he participated in.

The Court will not allow the Plaintiffs to depose all of the Defendants to determine in which actions, if any, Leveling participated.  Such discovery is too broad, not narrowly tailored, and would

---

[7] Because the Court finds that the alleged action of kicking a detainee while the detainee is in handcuffs, lying on the ground, and held at gun point could constitute excessive force and will allow the Plaintiffs to engage in limited discovery as to their excessive force claims against Leveling, the Court will delay ruling on all excessive force claims against Leveling until the Plaintiffs have had an opportunity to conduct the limited discovery that the Court will allow.  The Court will therefore not decide whether excessive force is shown by an officer continuing to point a gun at detainees who are lying on the ground, in handcuffs, and offering no resistance, though such an act might constitute excessive force.  See Holland v. Harrington, 268 F.3d at 1193 ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.").

subvert the goals of deciding issues on qualified immunity early in litigation. Although the Plaintiffs, at the hearing on this motion, requested a lineup of all the Defendants, see Transcript of Hearing at 43:6-15, the Court believes that such discovery is overly broad and not narrowly tailored to the precise issue whether Leveling is entitled to qualified immunity. The Court will, however, grant Plaintiffs the opportunity to do a lineup of one with Leveling so that they can put a face with Officer Leveling's name to determine whether he engaged in the complained of actions that could constitute excessive force. Leveling has the choice of either providing recent photo identification -- within the last two years -- for the lineup, or to participate in a one person lineup so that the Plaintiffs can determine whether he pointed a gun at them, and whether he kicked or stepped on them, while they were in handcuffs.[8]

After viewing Leveling, either in person, or in a photograph, the Plaintiffs may very well conclude that he did not point a gun at them, and he did not kick or step on them while they were in handcuffs. They may, however, conclude that he did those things. Because the issue of qualified immunity hinges on whether Leveling participated in these actions, and his admissions combined with the Plaintiffs' allegations connect his qualified immunity defense to the sought discovery in a way that Gonzales, Grommes, Hackett, Hammonds, and Hubbard's qualified immunity defenses were not connected, the Court will delay ruling on the issue of Leveling's qualified immunity until the Plaintiffs have an opportunity to engage in the limited discovery described above.

_____

[8] The Plaintiffs also contend that the Court should stay determination of the reasonableness of Leveling's use of force until it decides the lawfulness of the warrant. See Response at 9. The Plaintiffs do not cite the Court to any precedent for their contention that the law permitting officers to carry weapons when they enter someone's home is also predicated upon the lawfulness of the entry and thus dependent on the lawfulness of the search warrant. As discussed and decided earlier, the lawfulness of the warrant, based on Robbin Burge's alleged false testimony, is not a necessary inquiry.

Once the Plaintiffs have engaged in the requested limited discovery that the Court has described, it will then be their burden to show that the actions they allege in which Leveling participated violate clearly established constitutional rights.

Finally, the Defendants request that the Court award them costs.  <u>See</u> Memorandum in Support at 12; Motion for Summary Judgment at 1.  The Defendants have not, however, indicated on which basis they believe they are entitled to costs, and they have not complied with D.N.M. LR-Civ. 54, either in timing or substance.  The Court will therefore not award the Defendants their costs.

**IT IS ORDERED** that the Defendants Gonzales, Grommes, Hackett, Hammonds, Hubbard, and Leveling's Motion for Summary Judgement Requesting Dismissal of Plaintiffs' Complaint is granted in part and ruling is delayed in part.  The Court will dismiss all claims against Gonzales, Grommes, Hackett, Hammonds, and Hubbard with prejudice.  The Court will delay ruling on Leveling's qualified immunity defense until the Plaintiffs have an opportunity to engage in limited discovery.  Leveling will make himself available for a one person lineup either in person or in the form of a recent photograph.

_____
UNITED STATES DISTRICT JUDGE

-40-

*Counsel:*

Dennis W. Montoya
Montoya Law, Inc.
Rio Rancho, New Mexico

      *Attorney for the Plaintiffs*

Robert M. White
  City Attorney
Stephanie M. Griffin
  Assistant City Attorney
City of Albuquerque
Albuquerque, New Mexico

      *Attorneys for the Defendants City of Albuquerque, Nicolas Gonzales,*
      *Scott Grommes, Pete Hackett, Daren Hammonds, Dave Hubbard,*
      *and Eric Leveling*

Stephen French
French & Associates, PC,
Albuquerque, New Mexico

      *Attorney for the Defendant City of Rio Ranch, KP Doering,*
      *G. Wiseman, Jason Bowie, R. Vigil*